489 P.2d 225

The STATE of Arizona, Appellee,

v.

Willie DIXON, Jr., aka Woody Dixon,
Appellant.

No. 2160.

Supreme Court of Arizona,
In Division.

Oct. 5, 1971.

Rehearing Denied Nov. 4, 1971.

Gary K. Nelson, Atty. Gen. by Paul J. Prato, Asst. Atty. Gen., Phoenix, for appellee.

Bernard I. Rabinovitz, Tucson, for appellant.

CAMERON, Justice.

On 20 October 1969, Early Reece, Jr., was fatally shot in the head while sitting in an automobile in the parking lot of the El Capitan Apartments in Tucson, Arizona. In a subsequent criminal action, Willie Dixon, Jr., was convicted of voluntary manslaughter and sentenced to the Arizona State Prison for a term of not less than eight nor more than ten years. From that verdict, judgment, and sentence he appeals. We are called upon by the appellant to decide:

1. Had the appellant been properly warned of his rights at the accusatory stage, and was it proper to admit the resultant conversation with Officer Bunting?

2. Was it proper for the court to admit the testimony of Penny Strobel, as an excited utterance exception to the hearsay rule?

3. Was it proper for the court to permit the testimony of Lester Medford from the preliminary hearing to be read into evidence?

4. Was it proper for the court to allow the question of voluntary manslaughter to go to the jury?

## SUFFICIENCY OF THE MIRANDA WARNINGS

The defendant voluntarily appeared at the police station later on that same evening to inquire of the shooting. A short discussion with Detective Bunting led the officer to believe Dixon's involvement was more than the casual curiosity of a friend. Thereupon Dixon was read his rights from a "Miranda card" and was questioned briefly. It is admitted that the investigation had not yet focused on defendant as a suspect. The police, however, in the interim, obtained information from another witness which incriminated the defendant and at that time the focus shifted to Dixon as a prime suspect. The police testified that at this stage Dixon, who had remained in the station, was considered to be in custody. The following testimony was given by the police officer concerning the custodial interrogation:

"Q  You did at the beginning of your conversation, however, ask him if he had been advised of his rights, is that correct?

"A  That's correct.

"Q  What did he say?

"A  He said 'Yes.' He had been advised of his rights."

Both before and after the accusatory stage had been reached, the defendant made exculpatory and inculpatory statements which were admitted into evidence over objection.

Appellant urges this perfunctory inquiry was insufficient. We disagree. This interrogation took place within a time span of two hours after his original arrival. His stay during the interim was not a result of physical detention or coercion. Dixon was, in fact, free to leave at any time prior to his arrest at 9:50 P.M. We hold that where the "Miranda warnings" have been given prior to reaching the accusatory stage, they may, within a reasonable time after the Miranda warnings are first given, be renewed in the manner herein. What is a reasonable time will depend upon the circumstances in each case. Here, the defendant was in the stationhouse voluntarily and had been warned of his rights when one officer became suspicious. There is no doubt that he had been adequately informed of his rights when he made his statements both before and after the accusatory stage had been reached:

"  *  *  *  The trial court determined that defendant's statements were made knowingly, voluntarily and intelligently. Once a defendant is fully and fairly apprised of his rights, there is no requirement that warnings be repeated each time that questioning is commenced. State v. Jennings, 104 Ariz. 6, 448 P.2d 62 (1968); People v. Hill, 39 Ill.2d 125, 233 N.E.2d 367 (1968)." State v. Quinones, 105 Ariz. 380, 382, 465 P.2d 360, 362 (1970).

## EXCITED UTTERANCES

The evidence indicates that Penny Strobel was in a car driven by "Shine" Dixon in which Larry Dixon and Donna Ampey (phonetic) also were passengers. All were at the scene of the homicide and left immediately thereafter. They proceeded to a nearby park and Shine and Larry returned to the scene. Upon their return, one of them, Penny was not able to discern which, said, "He shot his best friend." Over objection and after laying a foundation therefor, Penny was permitted to so testify. Appellant urges this admittance was erroneous. Penny Strobel testified as follows:

"Q  I see.  Now, after the last shot was fired, what happened?

"A  Larry and Shine and Papa got in the car and drove us across the street.

"Q  Just across the street from the El Capitan Apartments?

"A  Well, it was—they drove down the road a little bit, but it was in the park.

"Q  And what happened then?

"A  Then they got back out of the car and went back over there.

"Q  And how long were they gone or did they come back?

"A  Yeah, about ten or fifteen minutes.

  *   *   *   *   *   *

"Q  Then they came back to the car, who was it that came back to the car?

"A  Larry and Shine and Papa.  .

  *   *   *   *   *   *

"Q  Okay, could you describe Shine at that time—Edward Dixon, when he got back to the car?

"A  Well, he was crying and they were talking."

And:

"Q  Can you tell us as close to the exact words as they used when they got into the car?

"A  They said two things.  They said 'He shot his own best friend' and then a little while later they said 'It was his best friend'."

This State is committed to the Wigmorian view of excited utterance exception to the hearsay rule. 6 Wigmore on Evidence (3rd Ed.), § 1750, p. 142, et seq.

"These statements would obviously be hearsay unless they are admissible under the 'excited utterance' or 'spontaneous exclamation' exception to the hearsay rule. The requisites for an 'excited utterance' are as follows:

1.  There must be a startling event.

2.  The words spoken must be spoken soon after the event so as not to give

the person speaking the words a time to fabricate.

3. The words spoken must relate to the startling event. State v. McLain, 74 Ariz. 132, 245 P.2d 278 (1952)."

State v. Hunt, 2 Ariz.App. 6, 16, 406 P.2d 208, 218 (1965).

■■ Before the utterance may be admitted as a hearsay exception there must also be a showing that the person making the statement did, in fact, have an opportunity to observe personally the matter of which he speaks. 6 Wigmore, supra, § 1751. In the instant case, the excited utterance was made after the witness had returned from viewing the scene and not immediately after the shooting itself. They were in no position to observe who shot the victim at that time. We believe it was error to admit the statement. This does not require reversal, however, since the evidence is ample from which we can conclude that the jury would have reached the same verdict without this testimony. On the facts of this case, this error was harmless. Arizona Constitution, Art. 6, § 27, A.R.S.; § 13–1598 A.R.S.; cf. State v. Brady, 105 Ariz. 190, 461 P.2d 488 (1969); Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

## ADMISSIBILITY OF THE PRELIMINARY HEARING TRANSCRIPT

■■ Lester Medford was the primary prosecution witness. It was his testimony which was indicative of a deliberate killing:

"Q    Could you tell us what happened in the apartment that evening, what were you doing?

"A    At first I moved—we were just laughing and talking and watching T.V. and then Lawrence told Woody, 'let's go' you know so we got up and walked out the front door and then—so, see, he started boxing on Larry Dixon, O.C.

"Q    Pardon me, O.C.?

"A    Yes, Otis Charles. We call him O.C. and Woody, he started boxing

Shine, Shine Dixon, and then he put out the gun and he shot down at the ground and then Junior Rees (sic), he told him to put the gun up and then he walked over to the car and he just went like that and shot him. That was it."

Having testified at the preliminary hearing Lester Medford refused to testify when called at trial. His refusal was not substantiated by a Fifth Amendment privilege and consequently he was held in contempt of court. The trial court, pursuant to Rule 30, Rules of Criminal Procedure, 17 A.R.S., admitted his testimony taken at the preliminary hearing into evidence. The testimony of other absent witnesses was also admitted over the objection of the defendant, but Lester Medford's was the most damaging to the defendant. The testimony was read to the jury by re-enactment procedures, substituting a representative of the County Attorney's office for Mr. Medford. Rule 30, as relevant, reads as follows:

"When a witness has been examined * * * and his testimony taken * * *, such testimony may be admitted upon the trial of the defendant for the offense for which he is held, either on behalf of the state or the defendant, if for any reason the testimony of a witness cannot be obtained at the trial and the court is satisfied that the inability to procure such testimony is not due to the fault of the party offering it."

We have examined the facts of this case as to Medford's testimony and the others and find them in accordance with admission under Rule 30. While the literal language of Rule 30 says that "if for *any* reason the testimony * * * cannot be obtained", the rule further requires that the court must be satisfied that "inability to procure such testimony is not due to the fault of the party offering it." The prosecution must show that the inability is not chargeable to them. They satisfactorily did so as to Medford and the record demonstrates the reasons, be they valid or not, for his refusal. As to the others, as noted in our earlier

cases, such admissibility requires a "sufficient good faith showing * * * that the witnesses had been subpoenaed and were not available for the trial, in compliance with Barber v. Page, 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968)." State v. Wooldridge, 13 Ariz.App. 501, 478 P.2d 116 (1971).

"The prosecution made an adequate showing of the witness's availability to justify the court in permitting the testimony to be read from the transcript. At the preliminary hearing defendant did conduct a very thorough cross-examination of the witness. We upheld the introduction of testimony from the preliminary hearing transcript under similar circumstances in State v. Head, 91 Ariz. 246, 371 P.2d 599 * * *." State v. Stuard, 104 Ariz. 305, 306, 452 P.2d 98, 99 (1969). See also State v. Reynolds, 7 Ariz.App. 48, 436 P.2d 142 (1968); cf. State v. Cumbo, 9 Ariz.App. 253, 451 P.2d 333 (1969).

But defendant also raises the question of the right to confrontation. It is true that our Court of Appeals in the case of State v. Hall, 12 Ariz.App. 147, 468 P.2d 598 (1970), indicated that the confrontation clause of the Sixth Amendment would bar the admission of such preliminary hearing testimony as Lester Medford's even though the defendant was represented at the preliminary hearing and had the opportunity and did, in fact, cross-examine at the hearing. The Court of Appeals relied upon statements of the United States Supreme Court in Barber v. Page, 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968). After the Arizona appellate court case of State v. Hall, supra, the United States Supreme Court in a case wherein a witness testified for the State at a preliminary hearing and then could not remember at the trial, stated:

"* * * In the present case respondent's counsel does not appear to have been significantly limited in any way in the scope or nature of his cross-examin-

ation of the witness Porter at the preliminary hearing. If Porter had died or was otherwise unavailable, the Confrontation Clause would not have been violated by admitting his testimony given at the preliminary hearing—the right of cross-examination then afforded provides substantial compliance with the purposes behind the confrontation requirement, as long as the declarant's inability to give live testimony is in no way the fault of the State. Compare Barber v. Page, supra, with Motes v. United States, 178 U.S. 458, 20 S.Ct. 993, 44 L.Ed. 1150 (1900).

"But nothing in Barber v. Page or in other cases in this Court indicates that a different result must follow where the State produces the declarant and swears him as a witness at the trial. It may be that the rules of evidence applicable in state or federal courts would restrict resort to prior sworn testimony where the declarant is present at the trial. But as a constitutional matter, it is untenable to construe the Confrontation Clause to permit the use of prior testimony to prove the State's case where the declarant never appears, but to bar that testimony where the declarant is present at the trial, exposed to the defendant and the trier of fact, and subject to cross-examination. As in the case where the witness is physically unproducible, the State here has made every effort to introduce its evidence through the live testimony of the witness; it produced Porter at trial, swore him as a witness, and tendered him for cross-examination. Whether Porter then testified in a manner consistent or inconsistent with his preliminary hearing testimony, claimed a loss of memory, claimed his privilege against compulsory self-incrimination, or simply refused to answer, nothing in the Confrontation Clause prohibited the State from also relying on his prior testimony to prove its case against Green." California v. Green, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489, 501, 502 (1970).

## VOLUNTARY MANSLAUGHTER

The trial court (after directing a verdict in the defendant's favor on first degree murder and after overruling a motion for a directed verdict on voluntary manslaughter) charged as to second degree murder, voluntary manslaughter, and involuntary manslaughter. After the jury returned a verdict of guilty of voluntary manslaughter, the court denied a motion for new trial.

Manslaughter is defined as follows:

"§ 13–456. Kinds of manslaughter

"Manslaughter is of two kinds:

"1. *Voluntary, upon a sudden quarrel or heat of passion.*

"2. Involuntary, in the commission of an unlawful act not amounting to a felony, or in the commission of a lawful act which might produce death in an unlawful manner, or without due caution and circumspection." (Emphasis added)

■ The problem in this case arises because voluntary manslaughter is committed intentionally while involuntary manslaughter is committed unintentionally. State v. Douglas, 2 Ariz.App. 178, 407 P.2d 117 (1965); State v. Foggy, 101 Ariz. 459, 420 P.2d 934 (1966); State v. Prewitt, 104 Ariz. 326, 452 P.2d 500 (1969). The use of a deadly weapon, of course, gives rise to presumption of the intent to kill. State v. Preis, 89 Ariz. 336, 362 P.2d 660 (1961). Thus, between degrees of manslaughter, the appearance at first blush is that of voluntary manslaughter when the use of a deadly weapon occurs. However, either a sudden quarrel or a killing in the heat of passion is also a prerequisite to voluntary manslaughter. Wiley v. State, 19 Ariz. 346, 170 P. 869 (1918); State v. Schantz, 98 Ariz. 200, 403 P.2d 521 (1965). Appellant asserts, and we concur, there is insubstantial evidence of a sudden quarrel or heat of passion, i. e. voluntary manslaughter. To be sure, Lester Medford did testify that Junior Reece told the defendant to "put the gun up." This testimony, however,

does not necessarily indicate hostility. In fact, Lester testified as follows:

"Q Okay. Now at that time and at any time that day, was there any kind of argument or any kind of bad words between Rees (sic) and Dixon?

"A No, they wasn't arguing.

"Q I see, but up until the time the shot rang out, everybody was having a good time and playing around, is that right?

"A Right."

All the other witnesses concurred in the nonexistence of any sudden quarrel or heat of passion. In short, absent that modicum of testimony, the record is devoid of any sudden quarrel.

■ The trial court had a duty to instruct the jury on every grade of offense reasonably supported by the evidence and conversely, to refuse to instruct as to the other grades of the offense not reasonably supported by the evidence. State v. Prewitt, supra; State v. Sorensen, 104 Ariz. 503, 455 P.2d 981 (1969). Voluntary manslaughter was not shown by the evidence. Involuntary manslaughter, however, was shown.

In this regard, this case presents a situation very similar to State v. Hunter, 102 Ariz. 472, 433 P.2d 22 (1967). Just as there was a burglary conviction in that case, so here is the defendant clearly guilty of manslaughter (at the very least), i. e. the unlawful killing of a human being without malice. § 13–455 A.R.S. Just as first and second "degree" burglary are mutually exclusive as true degrees of the same offense [see State v. Brady, 2 Ariz.App. 210, 407 P.2d 399 (1965)], so do intentional v. unintentional killings seem mutually exclusive. Nonetheless, in Hunter, supra, this court modified the conviction and judgment from first to second degree burglary, noting:

" * * * A conviction of burglary in the first degree is a conviction of burglary. * * * The finding as to degree is for the purpose of fixing his punishment.

* * * The trial record supports beyond a reasonable doubt defendant's guilt of burglary as the jury by its verdict found. * * * This doubt [as to time] does not affect the conclusiveness of the jury's verdict of burglary, and, since the verdict of first degree cannot be sustained, the verdict must be given effect as a verdict of guilty of burglary of the second degree. * * *.

*"This court has the authority under A.R.S. § 13–1716 and A.R.S. § 13–1717 to modify both the judgment and the sentence; * * *. We, therefore, pursuant to A.R.S. § 13–1716, modify the conviction and judgment to second-degree burglary."* State v. Hunter, supra at 478, of 102 Ariz., at 28 of 433 P.2d. (Emphasis added)

Therefore, the sentence is set aside, the judgment is ordered revised to conform to the evidence, and the matter remanded to the trial court for sentencing for involuntary manslaughter. State v. Gonzales, 105 Ariz. 434, 466 P.2d 388 (1970); Art. 6, § 5(4), Arizona Constitution.

HAYS, V. C. J., and UDALL, J., concur.